IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS

RACHEL D. DRAEGER, INDIVIDUALLY §
AND REPRESENTATIVE OF THE §
ESTATE OF ERNEST J. DRAEGER, §
DECEASED AND SANDRA L. YAUCHZY §
§
        Plaintiffs §
§
v. § No. SA-13-CA-1131
§
UNITED STATES OF AMERICA §
§
        Defendant §
§

### MEMORANDUM OPINION AND ORDER

This is an action for damages for wrongful death against the United States under the Federal Tort Claims Act, 28 U.S.C. §§ 2671, et seq. This Court has jurisdiction under 28 U.S.C. § 1346(b). The Court's findings of fact and conclusions of law are incorporated in this opinion.

Ernest J. Draeger, a 75-year old man, died in San Antonio, Texas on April 25, 2011. The cause of death was an acute ST-elevated myocardial infarction. The Plaintiffs in this case are his widow, Rachel, and his daughter, Sandra. In their complaint, they allege that medical treatment afforded the decedent at Wilford Hall Medical Center in San Antonio fell below the standard of care and was negligent, and that such negligence was a proximate cause of his fatal heart attack.

Ernest Draeger served in the United States Navy for more than 30 years. He retired from the Navy in 1987, and approximately two

years later commenced civilian work as a civil service employee of the Department of Defense. His duty station was the Medina Annex at Lackland Air Force Base in San Antonio. His precise job duties are not disclosed by the evidence because they were classified, but it appears that they were in the realm of military intelligence. He was required to maintain a "Top Secret" clearance. He was still working full-time at the time of his sudden death.

At age 75, Ernest Draeger was physically active and physically fit. He maintained a healthy diet. He enjoyed riding his bicycle and playing tennis, and he worked out at home. He also performed household chores and worked in his garden. He took his health seriously, and was never a "couch potato". Prior to April 22, 2011, he never complained to his wife or daughter about shortness of breath, chest pains, or any of the traditional symptoms of heart disease.

For some years, Mr. Draeger had been taking a drug (Atenolol) to control hypertension. With the help of his wife Rachel, he checked his blood pressure every day, and recorded the results. Those readings typically indicated a level of 130 or below, which would not be considered elevated.

In May 2003, Mr. Draeger had been hospitalized at Wilford Hall Medical Center because of a blood clot in his leg. He was diagnosed with peripheral arterial disease, and prescribed Coumadin, a blood thinner. This required regular monitoring of his

blood levels, so between 2003 and 2011, he visited the "Coumadin Clinic" at Wilford Hall on a frequent basis.[1] His blood levels were satisfactory, and there was no reoccurrence of the thrombus.

Dr. Rito Sauceda became Mr. Draeger's primary care physician in 2007. At the time he came under the care of Dr. Sauceda, Mr. Draeger was a male over 70-years of age who had been diagnosed with peripheral arterial disease. Because his patient was clearly in an "at risk" category, Dr. Sauceda focused his treatment on the so-called "modifiable risk factors": LDL cholesterol levels and hypertension.

When he was first seen by Dr. Sauceda in 2007, Mr. Draeger's LDL cholesterol level was 129. Although he had previously been prescribed a statin, Zocor, Dr. Sauceda doubled the dosage from 20 mg to 40 mg. His objective was to reduce the LDL cholesterol level to 100 or below.[2] In 2009, the Zocor dosage was increased again to 60 mg. By 2011, Mr. Draeger's LDL cholesterol level was in the range of 80 to 85.

As noted earlier, Mr. Draeger was taking a beta blocker, Atenolol, to control hypertension. In 2009, Dr. Sauceda increased the dosage of Atenolol to 75 mg. Nevertheless, the blood pressure

---

[1] The records reflect that he was seen in the Coumadin Clinic 146 times.

[2] In 2007, an LDL level of 100 or below met the standard generally accepted in the medical profession. A 2004 recommendation of a target level of 70 or below applied to men who had previously sustained a heart attack.

3

readings at the clinic remained stubbornly high. This was puzzling, because the readings in the clinic were in sharp contrast with the duly recorded daily results of blood pressure testing at home. Wilford Hall Medical Center had furnished Mr. Draeger the equipment with which to test his blood pressure, and his wife Rachel used it every evening. Mr. Draeger was meticulous in maintaining records showing the results of each daily test, and he showed his log to Dr. Sauceda on every visit. As noted, the home readings were not elevated. In contrast, the blood pressure readings taken at the clinic indicated fairly severe hypertension.[3] Dr. Sauceda concluded that the explanation for this contradiction lay in the phenomenon known as "White Coat Hypertension". An individual with this condition becomes so nervous upon visiting a doctor's office or clinic that it causes his blood pressure reading to be abnormally high. In this case, evidence in the patient's medical records supported the conclusion reached by Dr. Sauceda. In July 2005, long before he met Dr. Sauceda, a note in Mr. Draeger's medical records identified him as having White Coat Hypertension. Another note, dated January 3, 2006, records Mr. Draeger's admission that he "felt nervous" on every visit to the clinic.

Although Mr. Draeger was in the "at risk" category, Dr.

---

[3] One exception to this occurred on December 3, 2010, when his blood pressure reading at the clinic was 130/85, a result similar to many of the readings found in the records of his home testing.

4

Sauceda did not refer him to Cardiology for the purpose of administering a stress test or an echocardiagram, because the patient was asymptomatic. From his first meeting with Dr. Sauceda to his last meeting, Mr. Draeger denied experiencing any angina, shortness of breath, or any other symptoms of cardiovascular disease.

Before dawn on April 22, 2011, Ernest Draeger awoke experiencing severe shortness of breath. Rachel Draeger called an ambulance. When the ambulance arrived, she requested that her husband be taken immediately to Wilford Hall Medical Center. According to Mrs. Draeger, one of the EMS personnel stated that he might not make it that far.[4] Instead of transporting Mr. Draeger to Wilford Hall, the EMS drove to the nearest hospital, Santa Rosa-Westover Hills. Emergency room records reflect that he arrived at approximately 5:52 a.m. At the time of his arrival, his complaint remained shortness of breath. Emergency room personnel administered diagnostic tests, including blood tests and an EKG. The test results and the observations of the attending physicians indicated that Mr. Draeger was experiencing a serious cardiac event. An EKG at 6:31 a.m. suggested that he was undergoing myocardial infarction. Westover Hills did not have the facilities to treat his condition, so arrangements were made to airlift him to

---

[4]The Draegers resided in Helotes, Texas, just west of San Antonio. The trip by ambulance from Helotes to Wilford Hall should have taken no more than 30 minutes.

a larger sister hospital in downtown San Antonio, where angiography could be performed. For reasons that are not clear from the record, the transfer took too much time. The helicopter bearing Mr. Draeger did not leave Westover Hills until about 8:20 a.m. The trip downtown took about 10 minutes.

Upon his arrival at Christus Santa Rosa downtown, the cardiologist attempted angiography. It was unsuccessful; one artery was 99 percent occluded, so the catheter could not make it through. The physicians then performed heart bypass surgery. The surgery restored blood flow, but it came too late. There was irreversible heart damage and cardiogenic shock, from which Mr. Draeger was unable to recover. He never regained consciousness and expired on April 25, 2011.

In an action for damages for personal injuries or wrongful death under the Federal Tort Claims Act, the Court is required to apply the law of the state in which the allegedly negligent act or omission occurred. 28 U.S.C. §§ 1346(b)(1); 2674. In Texas, a plaintiff who alleges medical malpractice has the burden of proving each of the following by a preponderance of the evidence: (1) a duty by the physician to act according to an applicable standard of care; (2) a breach of that duty; (3) an injury; and (4) a causal connection between the breach of the standard of care and the injury. **Quijano v. United States**, 325 F.3d 564, 567 (5th Cir. 2003); **Mills v. Angel**, 995 S.W.2d 262, 267 (Tex.App.-Texarkana

1999, no pet.). Expert testimony is typically required to prove the applicable standard of care. **Hood v. Phillips**, 554 S.W.2d 160, 165-66 (Tex. 1977); **Bowles v. Bourdon**, 148 Tex. 1, 219 S.W.2d 779, 782 (1949).[5]

The Plaintiffs presented two expert medical witnesses, Dr. Brant Mittler and Dr. Bruce Dechter. Both witnesses contended that Defendant's physicians, and particularly Dr. Sauceda, did not meet the standard of care and were negligent in their treatment of Ernest Draeger. They contend that Mr. Draeger, a 70-year-old male with a history of peripheral arterial disease, had uncontrolled hypertension and insufficiently controlled levels of LDL cholesterol. In their opinions, the standard of care required that he be referred to Cardiology for the administration of a stress test or an echocardiogram, or both, to detect left ventricular hypertrophy or arterial stenosis.[6] If the tests indicated the presence of stenosis, angioplasty would have been required to

---

[5] Texas cases speak of the standard of care in the community in which the treatment was afforded, or in a similar community (the "locality rule"). **Birchfield v. Texarkana Memorial Hospital**, 747 S.W.2d 361, 366 (Tex. 1987); **Quijano**, 325 F.3d at 568. In the instant case, the Plaintiffs' expert witnesses testified that there was a "national standard of care" for the treatment of cardiac patients over the age of 65. The Defendant does not appear to challenge their testimony in this regard, and offered no expert testimony of its own that the standard of care in San Antonio, Texas differed from that in other communities.

[6] Mr. Draeger had undergone an echocardiogram in 2000, when he was approximately 64 years of age. The test did not reveal the presence of left ventricular hypertrophy at that time.

7

"revascularize" or open up the occluded arteries. Plaintiffs' medical experts disagree with Dr. Sauceda's diagnosis of White Coat Hypertension, and vigorously disagree with his reliance on the records maintained by Mr. Draeger of his home blood pressure test results. They contend that the standard of care required that Mr. Draeger be fitted out with an ambulatory 24-hour monitor, which would measure his blood pressure at all hours of the day and night, at home and at work, and detect fluctuations therein. With respect to the element of proximate cause, it was the testimony of the Plaintiffs' medical experts that had these procedures been followed in accordance with the standard of care, in reasonable medical probability Mr. Draeger's fatal heart attack in April 2011 would have been prevented, and he would have lived at least ten years longer.

The Court finds that the Plaintiffs have failed to sustain their burden of proving that the treatment afforded Ernest Draeger by the physicians at Wilford Hall Medical Center fell below the standard of care. Mr. Draeger was clearly in an "at risk" group, in that he was a male, over 65 years of age, who had been diagnosed with arterial disease. He was afforded conservative treatment, designed for a patient with his risk profile, but who displayed no symptoms. That treatment focused on the modifiable risk factors. Two of those factors, diet and exercise, were not cause for concern. Mr. Draeger maintained a healthy lifestyle, and was

8

physically active. To reduce his level of LDL cholesterol, a statin was prescribed, and the dosage was increased by Dr. Sauceda on two occasions. This drug therapy succeeded in lowering Mr. Draeger's LDL cholesterol level to the target range of less than 100.

The cornerstone of Plaintiffs' claim is that Mr. Draeger had uncontrolled hypertension, and for a man in his risk category, the standard of care required that he be referred for a stress test or echocardiogram, or both. They contend that the failure of Defendant's physicians to order these tests was negligent. The Defendant counters with the fact that Mr. Draeger was asymptomatic; that the elevated blood pressure readings in the clinic were the product of White Coat Hypertension, and that the standard of care did not require further tests.

The evidence shows that up until April 22, 2011, Ernest Draeger was asymptomatic. This was not just the impression he gave Dr. Sauceda on his clinical visits; it was verified by the testimony of his family members. Although Mr. Draeger was physically active, he never complained of chest pains, shortness of breath, or easy fatigue. The results of his daily blood pressure testing at home were meticulously recorded, and those readings were not elevated. Dr. Sauceda reviewed those records on every clinic visit, and he considered them reliable. He concluded, therefore, based on reasonable medical probability, that the elevated readings

9

on his clinic visits were explained by White Coat Hypertension. In connection with that diagnosis, the Court notes the following evidence:

(1) Mr. Draeger's medical records contain a notation dated July 25, 2005, that the patient acknowledged having White Coat Hypertension.

(2) The medical records also contain a note dated January 3, 2006, that Mr. Draeger reported that he was "nervous" each time he came to the clinic.

(3) The medical records also contain some details regarding Mr. Draeger's visit to the Emergency Clinic on April 12, 2011, only a few days before his death. On that occasion, his blood pressure was checked twice. The first reading was 178/106, and the second, a short time later, was 140/72.[7]

Plaintiffs' expert witnesses contend that the failure to employ an ambulatory blood pressure monitor fell below the standard of care. Although the use of the monitor would have been a viable alternative, it was not the only method of monitoring Ernest Draeger's blood pressure on a daily basis. Dr. Sauceda was aware that by training and by personality, Ernest Draeger was a man who

---

[7] Dr. Sauceda last saw Mr. Draeger in March, and was not aware of his April visit to the Emergency Clinic. Nevertheless, the dramatic change in blood pressure readings tends to support his diagnosis of White Coat Hypertension.

did things "by the book". His blood pressure was checked at home every day; he maintained careful records of the results; and he showed those records to his doctor on every visit to the clinic. Based on the evidence, Dr. Sauceda's reliance on the patient's record keeping was reasonable.

The Plaintiffs have also failed to sustain their burden of proving that the failure to order further diagnostic tests was a proximate cause of Mr. Draeger's fatal heart attack. The evidence is insufficient to show that the administration of an echocardiogram or a stress test would have prevented Ernest Draeger's myocardial infarction in April 2011.

An echocardiogram is a useful tool in diagnosing Left Ventricular Hypertrophy (LVH). However, the evidence does not establish that Ernest Draeger ever developed LVH. His echocardiogram in the year 2000 did not reveal LVH, and it was essentially normal. Whether a later echocardiogram would have resulted in significant findings is mere speculation.[8]

Plaintiffs' expert witnesses contended that a stress test could have indicated reduced blood flow, leading to the discovery of arterial stenosis and the use of angiography. It cannot be determined from the evidence, however, just when the stenosis began to impair blood flow to the degree that a stress test would have

---

[8] On April 12, 2011, when Mr. Draeger visited the Emergency Clinic, a chest x-ray was taken. It showed a normal cardiac profile, and did not indicate enlargement of the heart.

11

detected it. The experts on both sides agreed that it was a slow process, but how slow? Would a stress test in 2003, for example, have detected the stenosis? Would it have done so in 2005, or in 2007? Because of lack of evidence, the Court is being invited to speculate, and a finding of proximate cause cannot be based on speculation.

Finally, the Defendant contends that delay on the part of Santa Rosa-Westover Hills in transferring Ernest Draeger to another, better equipped facility was the sole proximate case of his death. To be successful, this defense requires the Court to find that an independent act or omission by a person or entity not a party to the lawsuit was the sole proximate cause of the injury or harm. **Dillard v. Texas Electric Cooperative**, 157 S.W.3d 429, 432 (Tex. 2005).

In this case, the unidentified EMS personnel who responded to the 911 call transported Mr. Draeger to the hospital closest to his residence: Santa Rosa-Westover Hills. When the physicians on duty there became aware that he could be experiencing a myocardial infarction (possibly as early as 6:31 a.m.), he should have been transported as quickly as possible to a hospital equipped to treat his condition. That transportation did occur, but not until 8:22 a.m. The time elapsed was from thirty to sixty minutes longer than should have been the case. The question presented, however, is whether but for that delay, based on reasonable medical

probability, Mr. Draeger would have survived the heart attack. The evidence is insufficient upon which to base that finding. Because it invites the Court to indulge in speculation, the defense of sole proximate cause must be rejected.

In summary, the Plaintiffs have failed to prove by a preponderance of the evidence that the treatment afforded Ernest Draeger at Wilford Hall Medical Center fell below the applicable standard of care and was negligent. In addition, the evidence failed to establish that the acts or omissions of the physicians at Wilford Hall were a proximate cause of the myocardial infarction that caused Mr. Draeger's death.

It is therefore ORDERED that judgment be, and it is hereby, ENTERED in favor of the Defendant, and that the Plaintiffs take nothing by their suit.

SIGNED AND ENTERED this 29th day of September, 2015.

HARRY LEE HUDSPETH
SENIOR UNITED STATES DISTRICT JUDGE